[L. A. No. 29583.   In Bank.   Feb. 6, 1969.]

PIERPONT INN, INC., Plaintiff and Respondent, v. STATE OF CALIFORNIA, Defendant and Appellant.

Harry S. Fenton, R. B. Pegram, Joseph A. Montoya, Richard L. Franck, Charles E. Spencer, Jr., George W. Miley and Elbert E. Hensley, Jr., for Defendant and Appellant.

Gustafson & Cohen and Roy A. Gustafson for Plaintiff and Respondent.

BURKE, J.—In this inverse condemnation action defendant State of California appeals from the judgment entered in favor of plaintiff. A hearing was granted by this court, after decision by the Court of Appeal, Second Appellate District, Division Two, for the purpose of giving further study to the problems presented. After such study we have concluded that the opinion of the Court of Appeal, prepared by Justice Herndon, correctly treats and disposes of the issues involved, and it is therefore, with certain minor deletions and additions, adopted as and for the opinion of this court. Such opinion (with deletions and additions as indicated) is as follows:[1]

[ ] Appellant's primary contention is that respondent's claim was not filed within the time allowed by section 644 of the Government Code with the result that respondent's action is barred. Additional assignments of error relate to the factual determinations made by the trial court and the standards adopted for ascertaining respondent's damages and the dates from which interest thereon should be computed. We

---

[1]Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. (*Simmons* v. *Civil Service Emp. Ins. Co.* (1962) 57 Cal.2d 381, 383, fn. 1 [19 Cal.Rptr. 662, 369 P.2d 262]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 540, fn. 1 [63 Cal.Rptr. 21, 432 P.2d 717]; *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 637, fn. 1 [63 Cal.Rptr. 391, 433 P.2d 183].)

have concluded that none of these contentions is meritorious.

Respondent is the owner of the Pierpont Inn, a hotel in Ventura, California, consisting of a main building and guest cottages situated on a somewhat elevated parcel of land overlooking the Pacific Ocean. Respondent's property is a parcel of 7.37 acres divided by San Jon Road which runs north-south over the property [near its westerly boundary], to the public beach lying below [and adjacent to] its southerly boundary.

In 1951, respondent's predecessor in title had donated to the state the portion of the property lying west of San Jon Road by deed containing a condition subsequent that the land should "be forever used for the development and maintenance of a State park under the jurisdiction of the State Park Commission." No park was ever developed thereon and on August 18, 1959, appellant's Director of Natural Resources executed a deed granting an easement to its Department of Public Works and authorizing the construction of the freeway over a portion thereof. Grading and other preparatory work on the freeway began early in 1960, and on July 24, 1961, respondent declared a forfeiture for breach of the condition upon which the property had been granted to the state.

In a previous action brought upon the state's failure to reconvey, respondent sued the state to establish its title and to compel a reconveyance. Judgment in this former action was entered on November 30, 1962, in respondent's favor and declared that respondent "is now, and has been since July 24, 1961, vested with title" to the property; that the state "has no right, title or interest therein except the right to [remain in] possession of the portion" thereof devoted to public use as a freeway. No appeal was taken from this judgment. It became final and established respondent's ownership of the portion of the property involved therein.

In addition to the portion of respondent's property west of San Jon Road used for freeway purposes, respondent's complaint alleged that [a northerly strip of] the freeway is also located upon a southerly strip of its property lying to the east of San Jon Road. It was appellant's theory that this strip was not a part of respondent's property or, alternatively, that it had been subjected to a dedicated but unused road easement since 1909, and therefore its occupancy for freeway purposes did not constitute a taking of respondent's property for which compensation need be paid, either for the property itself or by way of severance damages.

On August 13, 1962, respondent filed its claim for damages

with the State Board of Control. It was rejected on November 15, 1962. The freeway itself was opened for traffic in October 1962, and was formally accepted by the state on November 20, 1962. Respondent filed the instant action on February 13, 1963. The judgment herein was entered on January 5, 1966, and awarded respondent damages which included the following elements:

(1) $31,308 for the part taken east of San Jon Road plus interest from February 1, 1960. (2) $4,318 for the part taken west of San Jon Road plus interest from July 24, 1961. (3) $35,000 for the diminution of the fair rental value of the remaining property from August 13, 1960, to the completion of construction on November 20, 1962, plus interest from November 20, 1962. (4) $155,000 for the permanent diminution of the fair market value of the remaining property plus interest from November 20, 1962, the date of completion of the freeway. (5) $188.85 for costs.

At the time construction of the freeway began, and at the time respondent filed its claim with the state and commenced the instant action, section 644 of the Government Code required that a claim be presented to the State Board of Control "within two years after the claim first arose or accrued." ▇ Appellant contends that this statutory period began to run when it entered upon respondent's land in February of 1960, or at the latest, when it began preliminary work in March of 1960.[2] Therefore, although respondent's claim was filed in August 1962, prior to the completion of the project, appellant contends that it was untimely with the

[2The work done in February 1960 was preliminary only, such as surveying and relocation of utilities. The resident engineer for the freeway project testified that the construction contract was approved in about March 1960, and that on March 8, 1960, he observed that the right-of-way and center line stakes were in place; in April 1960 construction of the realignment of San Jon Road was begun; in May 1960 clearing was begun of an area near the southern end of the easterly boundary of San Jon Road, including the cutting of pavement, fencing across a lookout point on Pierpont property and commencement of storm drain work; in June 1960 the driving of piling commenced for the San Jon Road and bridge, which was not completed for four or five months; in "August of 1960, embankment for the freeway was begun immediately in front of the Pierpont Inn. At various locations and various times for the next two and a half years, work was done in front of the Pierpont Inn." Further, that of the entire four and one-half miles of the freeway under construction, "the work at this particular portion . . . probably . . . would have been one-fifth completed by . . . the middle of August of 1960 . . . . As far as the amount of money spent on the contract" was concerned, inasmuch as construction extended over a period of 30 months and generally speaking the work progressed evenly throughout the entire contract.]

result that respondent is wholly barred from recovery. Neither reason nor precedent supports this contention.

There is a paucity of authority dealing with the problem of determining the exact date upon which a claim or cause of action for inverse condemnation arises. Prior to the age of the freeway, most inadvertent or intentional trespasses by authorities with the power of condemnation were of such a nature that there was only a relatively brief interval of time between the first invasion upon the land and the completion of the project itself. Such authority as does exist, however, supports the holding of the trial court herein.

In the early cases of *Williams* v. *Southern Pacific R.R. Co.,* 150 Cal. 624 [89 P. 599], and *Robinson* v. *Southern Cal. Ry. Co.,* 129 Cal. 8 [61 P. 947], it was held that the actions for damages were barred, it appearing that they had been commenced after the expiration of the statutory period running from the time the roads were built and placed in operation. In *Robinson,* the complaint was not filed until 1899. It was alleged that in May 1887, the defendant therein "entered upon the above-described lands of plaintiff and seized and took possession of a strip of said land one hundred feet in width, . . . that defendant '. . . constructed a steam railroad upon and over said strip of land, and completed the same on or about June, 1888; and that since November 7, 1889, the defendant has operated the said railroad.' " (P. 9.) The court stated at page 11:

"It seems to us that the complaint shows a trespass by defendant in 1889 for which plaintiff had his appropriate remedy. The complaint alleges an unlawful taking of possession in May, 1887; the damages alleged accrued at least as soon as the road was *built and operated,* which was in 1889." (Italics added.)

Similarly, in *Williams,* plaintiff's complaint alleged "that on January 1, 1900, . . . the defendant, . . . had entered upon the part of said land within Laurel Avenue, and laid a railroad track thereon; *that ever since said last-named date* the defendant *had operated its railroad* over said track, . . ." (Italics added.) Since the action in *Williams* had not been filed within three years after January 1, 1900, the court relied upon its earlier decision in *Robinson,* stating at page 627 that it had been held therein "that an action to recover damages for a wrongful entry by a railroad company upon the land of plaintiff, and the construction of its railroad thereupon, without proceedings for condemnation, and with-

out plaintiff's consent, is barred if not commenced within three years after the road *was built and operated.*" (Italics added.)

While their language and their reasoning tends to support the trial court's determination that respondent's claim was not untimely, the *Robinson* and *Williams* decisions are not conclusive since, as we have indicated, the court was not required in those cases to decide whether or not the statutory periods there in question might have begun to run at some date earlier than the date of completion of the projects.

In *Kafka* v. *Bozio,* 191 Cal. 746, 750-751 [218 P. 753, 29 A.L.R. 833], in distinguishing between cases involving permanent trespasses and "constantly increasing" nuisances, the court referred to these cases as standing for the rule that "the statute of limitations runs from the time of the original entry." However, in the context there employed it is clear the court had reference to the date when the trespassing encroachment first became permanent rather than when a trespass was first committed for purposes of construction.

Similar language was used in the same fashion in *Ocean Shore R.R. Co.* v. *City of Santa Cruz,* 198 Cal.App.2d 267, 271 [17 Cal.Rptr. 892]. That is to say, the court in no way was required to hold, nor did it hold, that the statutory period begins to run prior to the completion of the project in issue. Although the court used the expression "wrongful entry" in discussing the *Robinson* decision, *supra,* it stated that "The action was filed *10* years after the wrongful entry." Under the facts in *Robinson,* this statement necessarily refers to the date when the railroad was completed and placed in operation because that action was not filed until 12 years after the initial trespasses that preceded construction. In addition, in announcing its holding in *Ocean Shore R.R. Co., supra,* the court stated at page 272:

"Under the pleaded facts, the City took possession of appellant's right of way as late as 1925, and possibly as early as 1922. Upon taking possession the city constructed a public street by means of grading, graveling and oiling the roadway. The complaint characterizes these acts as having been done 'wrongfully' by the respondent city. Possession by the city, *and use of the roadway* as a public street has been open and continuous, with full knowledge of the appellant from at least 1925 until the date of the filing of the complaint (1959). Under these facts it is clear that the appellant's cause of action is barred. . . ." (Italics added.)

Two decisions, *Haigh* v. *City of Los Angeles,* 139 Cal.**App.**

595 [34 P.2d 779], and *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193 [143 P.2d 12], have dealt with the construction and application of the provisions of the Charter of the City of Los Angeles relating to the filing of claims and in each case it was expressly held that the six-month period allowed for the filing of claims did not begin to run in an inverse condemnation action from the time of the initial taking or invasion. The claims provision of the city charter required that the claim be presented "within six months *after the occurrence from which the damages arose*" rather than "within two years *after the claim first arose or accrued*," as does the statute here involved. (Italics added.) However, no point was made therein of this semantic distinction and it is self-evident that a claim or a cause of action for damages cannot arise or accrue prior to the occurrence from which the damages arise.

In *Haigh,* the defendant city did not even suggest, as does appellant in the instant action, that the limitation period began to run from the time that work was commenced upon the street abutting the property of the plaintiff therein. Rather, it urged only that the period commenced to run when that portion of the improvement which abutted the landowner's property *was completed and accepted* by the city. The court rejected even this limited contention, stating at page 599 :

"No authority is cited by appellant for its suggestion that when part of the improvement had been completed and approved the 'occurrence from which the damages arose' will be sufficiently complete to permit a claimant to file his demand. The contrary would seem to be true. The city council in this case treated the improvement as an entirety and included it in a single proceeding as it had a right to do [citation], and a citizen affected thereby would reasonably be expected, if not required, to adopt the same course. The board of public works, acting for the city, did not consider the work complete until it had so determined for itself and had accepted it, and plaintiff, as a citizen whose right to submit a claim for damages did not arise until the work resulting in the damage had been done, would properly be expected, if not required, to await its determination of this matter before taking any action to enforce a claim predicated thereon."

Similar reasoning was enunciated in *Natural Soda Products, Co., supra,* wherein a property owner claimed damages from the city for a flooding of his land which began in Febru-

ary 1937, reached its high point in May 1937 (although the water was still intermittently released thereon through July 1937), and did not fully subside until September 1937. The court held that a claim filed in December 1937, was timely, stating at page 203:

''The principal purpose of the requirement that claims be filed is to provide the city with full information concerning rights asserted against it, so that it may settle those of merit without litigation. [Citations.] That purpose is best served if the entire sequence of events giving rise to the injury is regarded as the 'occurrence from which the damage arose' for damages can be assessed accurately only when the sequence is completed and the total injury taken into account. Thus, in the present case the injuries continued to accumulate but were not entirely apparent so long as water remained on the lake bed. (See *Haigh* v. *City of Los Angeles,* 139 Cal.App. 595 [34 P.2d 779].)''

It is also worthy of notice that the dissenting opinion in *Natural Soda Products Co., supra,* did not quarrel with the proposition that the action therein was not barred because of failure to file a claim within six months after the first intrusion which caused damages. Justice Shenk, in his dissent, only pointed out that in addition to the reason underlying claims statutes expressed in the majority opinion, there was the further purpose of giving the city an opportunity to provide protection against damage by the continued acts complained of, should it deem itself liable. He therefore was of the opinion that while the claim was not untimely, it should include only those damages that were incurred within the six-month period preceding its filing with the city.

This view seems to have been adopted by the court in *Bellman* v. *County of Contra Costa,* 54 Cal.2d 363, 365 [5 Cal. Rptr. 692, 353 P.2d 300], wherein the applicable claims statute provided that ''A claim shall be filed within a year *after the last item accrued.*'' (Italics added.) In *Bellman,* a claim was filed in 1957, seeking damages for the continuing subsidence of plaintiff's property resulting from a removal of lateral support by the defendant county during a road widening project that was completed in 1952. The court determined that under the circumstances there considered, the ''fairest and most workable rule'' would be to hold that the claim was not barred by the statute but that the plaintiff might recover only on those items of damage which accrued within the applicable time period.

A somewhat similar consideration appears to have occurred

to the court in *Haigh, supra,* when it was observed at page 600 that, while this factor did not affect the decision, the plaintiff therein had given the city actual notice of his claim considerably earlier than the date upon which his formal legal claim was filed. That is to say, each of the cited decisions demonstrates an awareness that situations might arise wherein a property owner should not be permitted purposely to withhold notice from a governmental agency which he knows is proceeding mistakenly, but innocently, to damage his property in order to augment his damages and increase his recovery.

However, no such considerations are applicable in the instant case. At the very beginning of the trial of the legal issues herein, counsel for appellant advised the court: "In 1959—and this is of record in the case you have been asked to take judicial notice of—there was inquiry by an attorney representing [Pierpont Inn] about what we intended to do here. They felt they had an ownership in this area where they knew that the freeway was going to be built. Also in that case there is a copy of a letter from me to that attorney in, I believe it is June, 1959, setting forth the legal principles under which we felt that this was subject to an easement for public road purposes and the means by which it then came to the State of California. This is as far back as 1959, so that there is no surprise, or anything like that here."

Therefore, when the appellant in the instant action, with full knowledge of respondent's asserted rights in the premises, determined to proceed without exercising its powers of eminent domain in the manner prescribed by law, it cannot be heard to complain that the rules applicable to ordinary condemnation proceedings were not applied to the instant action which it forced upon respondent. Although enunciated in a decision dealing with the flooding of land, the reasoning of the United States Supreme Court in *United States* v. *Dickinson,* 331 U.S. 745, 747-749 [91 L.Ed. 1789, 1793-1794, 67 S.Ct. 1382], appears quite apposite to the instant appeal: "The Government argues that the statute began to run on October 21, 1936, when the dam began to impound water. In any event, it maintains that the six years began to run not later than on May 30, 1937, when the dam was fully capable of operation, the water was raised above its former level, and the property of the respondents was partially submerged for the first time. While on the latter view the time for taking had

not run under the statute, Dickinson's claim would be barred because he acquired the land after that date.

"The Government could, of course, have taken appropriate proceedings to condemn as early as it chose both land and flowage easements. By such proceedings it could have fixed the time when the property was 'taken.' The Government chose not to do so. It left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy. . . . [T]he claim traces back to the prohibition of the Fifth Amendment, 'nor shall private property be taken for public use, without just compensation.' The Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' [Citation.] One of the most theory-ridden of legal concepts is a 'cause of action.' This Court has recognized its 'shifting meanings' and the danger of determining rights based upon definitions of 'a cause of action' unrelated to the function which the concept serves in a particular situation. [Citation.]

". . . The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die. We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.

"When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided.

All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.' Accordingly, we find that the taking which was the basis of these suits was not complete six years prior to April 1, 1943, nor at a time preceding Dickinson's ownership [August 16, 1937]."

Similarly, in the present case the state "could have fixed the time when the property was 'taken' " by instituting, as early as it chose, an action to condemn whatever interest respondent owned in the property in issue. In this fashion it could have set the date of valuation at the date the summons was served and required respondent to accept such damages as might have been awarded by a verdict predetermining the impact of the projected freeway upon respondent's property even before any actual construction had been undertaken. However, it voluntarily elected not to do so. It may not now urge that respondent's formal claim was untimely because respondent reasonably awaited completion of the project in order to determine more accurately the exact extent to which its remaining property would be damaged. Certainly it is true that the extent of whatever severance damages were caused by the taking of respondent's land and the construction of the freeway project could be determined more accurately and more satisfactorily after the freeway was complete and in operation than would have been possible from a visualization of the project aided only by description and study of drawings and designs. These considerations contribute to the reasonableness of the rule here adopted quite apart from the fact that until construction had been completed, the plans for the freeway might have been substantially altered, the roadbed relocated or the entire project abandoned.

From a strictly pragmatic point of view, it is probable that careful engineering studies would as accurately indicate the amount of land that ultimately would be inundated by a proposed dam, and the damages that would be caused thereby as similar studies would indicate with respect to a projected multi-lane freeway. Therefore, the instant case is not truly distinguishable from *United States* v. *Dickinson, supra,* 331 U.S. 745, since the state chose not to avail itself of the procedures provided by law but rather "left the taking to physical events, thereby putting on the owner the onus of determin-

ing the decisive moment in the process of acquisition . . . when the fact of taking could no longer be in controversy. . . ."

We are not here called upon to determine the earliest possible date when a claim for damages could have been filed by respondent. It is sufficient for our present purposes to hold that the trial court did not err in determining that a claim filed prior to the completion of the portion of the project which took from respondent's land was not untimely. This determination avoids the "procedural rigidities" condemned by the United States Supreme Court in *United States* v. *Dickinson, supra,* 331 U.S. 745, and recognizes the validity of its postulate that the owner of land should not be "required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" On the other hand, we recognize the desirability of the promptness in the filing of claims which the legislative limitations are designed to require. Hence, we expressly refrain from deciding that an earlier filing of the claim in this case would have been premature.

In addition to its primary contention concerning the asserted bar of the claims statute which we have considered and rejected, appellant urges other errors in the proceedings below. ■■■ The contention that the court erred in finding that the property taken on the southern extremity of respondent's property east of San Jon Road was a part thereof and was not subject to a dedicated road easement is no more than an invitation to this court to reweigh the evidence presented upon this factual issue. This we cannot do. Each party called expert witnesses to aid the court in its task of interpreting the maps and boundary lines of the properties delineated therein.

To the extent that our consideration and interpretation of these "written instruments" is an independent review (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]), we agree with the determination reached by the trial court. However, in truth a realistic interpretation of these documents "turns upon the credibility of extrinsic evidence" (*Parsons* v. *Bristol Development Co., supra,* p. 865), and where, as here, such evidence is in conflict, the findings made by the trier of the fact are binding upon appellate review.

■■■ . Appellant contends that the trial court erred in permitting the jury to consider the property's loss of view and

relatively unrestricted access to the beach in determining severance damages. The court's ruling was correct. Where the property taken constitutes only a part of a larger parcel, the owner is entitled to recover, *inter alia,* the difference in the fair market value of his property in its "before" condition and the fair market value of the remaining portion thereof after the construction of the improvement on the portion taken. Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real property. Concededly such advantages are not absolute rights, but to the extent that the reasonable expectation of their continuance is destroyed by the construction placed upon the part taken, the owner suffers damages for which compensation must be paid.

"These elements of damages mentioned by the witnesses are not claimed by respondents as special damages, but are merely the reasons given by the experts for their opinions that the market value of the portion of the tract not taken would be diminished by reason of the taking of the 1/10-acre strip in front. . . . All of the matters mentioned were proper reasons to be advanced by the experts as bases for their opinions as to value. . . . Compensable items of severance damage, in fixing the fair market value of a remaining parcel, have been recognized to consist of impairment of light and air [citations], impairment of view [citations], invasion of privacy [citation], and deprivation of access [citation]." (*People* v. *Symons,* 54 Cal.2d 855, 859-860 [9 Cal.Rptr. 363, 357 P.2d 451]. See also [*Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 561 [319 P.2d 1033]] ; *Sacramento etc. Drainage Dist.* v. *Reed,* 215 Cal.App.2d 60, 71 [29 Cal.Rptr. 847].)

■ Appellant next contends that the court erred in ruling that there were no special benefits inasmuch as one expert witness testified that in his opinion respondent's property would benefit in the amount of $33,481 by reason of the existence of the freeway and the placement of an off-ramp in the vicinity of its property. The court's ruling was correct. Contrary to appellant's assertions, it is clear that the court did not base its holding upon the fact that the off-ramp itself was not located upon respondent's property. Rather, it was founded upon the proper recognition that this witness did not understand the technical meaning of "*special* benefits" because he acknowledged that the same benefit which accrued to respondent's property was received by "all the properties

in the vicinity'' and that it was not ''special or peculiar only to Pierpont Inn.'' ▇ It has long been the rule in California that severance damages are not to be diminished by *general* benefits resulting from a given public improvement. As stated in *Beveridge* v. *Lewis,* 137 Cal. 619, 625 [67 P. 1040, 70 P. 1083, 92 Am.St.Rep. 188, 59 L.R.A. 581] :

''The chance that land will increase in value as population increases and new facilities for transportation and new markets are created is an element of value quite generally taken into consideration in the purchase of land in estimating its present market value. This chance for gain is the property of the land-owner. If a part of his property is taken for the construction of the railway, he stands in reference to the other property not taken like similar property-owners in the neighborhood. His neighbors are not required to surrender this prospective enhancement of value in order to secure the increased facilities which the railroad will afford. If he is compelled to contribute all that he could possibly gain by the improvement, while others in all respects similarly affected by it are not required to do so, he does not receive the equal protection of the law.''

Appellant urges several points in support of its contention that the damages awarded herein were improperly determined. ▇ Initially, it asserts that the trial court erroneously fixed the date of valuation as the date of trial rather than February 1, 1960, when, as indicated, appellant contends that it ''took'' the property and respondent's ''claim first arose or accrued.'' Even if we were persuaded that the court had erred in fixing the time of trial as the date of valuation, we would reject February 1, 1960, as the valuation date for the reasons indicated in our discussion of appellant's primary assignment of error relating to the timeliness of respondent's claim. However, we do not regard the valuation date established by the court as erroneous.

Prior to its amendment in 1918, article I, section 14 of the California Constitution wholly prohibited the taking of private property without just compensation having first been paid to the owner thereof. (*City & County of San Francisco* v. *Collins,* 98 Cal. 259, 262 [33 P. 56].) Legislative efforts to ameliorate the inherent delay arising from the requirement that judicial proceedings be completed and damages paid before possession might be taken by the governmental agency involved were held to be unconstitutional. (*Steinhart* v. *Superior Court,* 137 Cal. 575, 578 [70 P. 629, 92 Am.St.Rep.

183, 59 L.R.A. 404].) Article I, section 14 of the California Constitution now provides in pertinent part:

"Private property shall not be taken or damaged for public use without just compensation *having first been made to, or paid into court for, the owner* . . . ; provided, that in any proceeding in eminent domain brought by the State . . . , the aforesaid State . . . may take immediate possession and use of any right of way . . . required for a public use . . . *upon first commencing eminent domain proceedings according to law* in a court of competent jurisdiction *and thereupon giving such security in the way of money deposited* as the court in which such proceedings are pending may direct, and in such amounts as the court may determine to be reasonably adequate to secure to the owner of the property sought to be taken immediate payment of just compensation for such taking and any damage incident thereto. . . ." (Italics added.) When the condemning agency proceeds in accordance with the statutory law governing the exercise of its power of eminent domain, section 1249 of the Code of Civil Procedure provides:

"For the purpose of assessing compensation and damages the right thereto shall be deemed to have accrued at the date of the issuance of summons and its actual value at that date shall be the measure of compensation for all property to be actually taken, and the basis of damages to property not actually taken but injuriously affected, in all cases where such damages are allowed as provided in Section 1248; *provided, that in any case in which the issue is not tried within one year after the date of the commencement of the action, unless the delay is caused by the defendant, the compensation and damages shall be deemed to have accrued at the date of the trial.* No improvements put upon the property subsequent to the date of the service of summons shall be included in the assessment of compensation or damages." (Italics added.)

It was through no fault of respondent that appellant, with full knowledge of respondent's asserted rights in the premises, determined to rely upon its own conception of such rights and to enter upon respondent's property without either payment therefor or the commencement of legal proceedings and the deposit of moneys with the court as provided by law. If a government agency must pay compensation computed from the date of trial when it has proceeded in accordance with the constitutional and statutory provisions regulating its power of eminent domain whenever it fails to bring the action

on for trial within one year after serving the summons, regardless of whether or not it has actually taken possession of the property (*City of San Rafael* v. *Wood,* 144 Cal.App.2d 604, 606 [301 P.2d 421]), it is scarcely to be heard to argue that when it determines to risk the possibility that it is wrongfully invading an owner's asserted property rights it should receive the benefit, if such it be, of an earlier evaluation date.

Of course, as we were at pains to point out in our discussion of appellant's contention that respondent's entire action was barred by its failure to comply with the applicable claims statutes, we need not here consider whether or not an earlier evaluation date might be established by the court in an instance where the government's action had been taken without knowledge of any adverse claim of ownership, or where a property owner deliberately allowed the government to proceed in ignorance of his rights or intentionally delayed the prosecution of an action brought to enforce his rights in order to increase the amount of compensation which he would ultimately receive. No such considerations are present here. Therefore, it is sufficient to hold, as we do, that in the context of the present action, it was not error for the trial court to establish the first day of trial as the evaluation date.

■ Lastly, appellant contends that the trial court erred in fixing the dates from which interest should be computed and in permitting the jury to compute the loss of use sustained by their remaining property in two segments rather than in one lump sum. It is immediately apparent, however, that appellant's assertion that interest should be computed from February 1, 1960, on all elements of compensation and damages rather than from July 24, 1961, and November 20, 1962, as established by the court, would only increase the amount of the judgment. Therefore, since appellant benefits therefrom, these rulings could not be regarded as prejudicial even if they were to be deemed erroneous. In fact, appellant tacitly concedes in its brief that it is not urging this court to increase the amount of the judgment but only pointing out what it regards as inconsistencies in the instant judgment to support its principal contention that the respondent's entire action was barred by its failure to comply with the applicable claims statute.

However, we do not regard the interest dates established by the court as erroneous. They appear to reflect the trial court's accurate recognition of the true factual picture presented· and

in every real sense are fair to appellant. Although it allowed interest on the fair market value of the property taken east of San Jon Road from February 1, 1960, as urged by appellant, it quite understandably decided that interest should not be allowed on the property taken west of San Jon Road until July 24, 1961, when respondent had exercised its right to declare a forfeiture of the state's title thereto for breach of the condition subsequent. Since respondent might have waived its rights in the premises entirely, it was certainly not unreasonable for the court to decline to grant it interest on the property owned and occupied by the state prior to the time it declared the forfeiture and revested the fee interest in itself.

Similarly, it was not unreasonable for the court to restrict the interest on the severance damages to the period following November 20, 1962, when the freeway had been completed and placed in operation since the loss of use suffered by respondent's property prior thereto had been computed separately and specifically. Interest is not the sole yardstick that may be adopted in computing the loss of use sustained by the owner of a remaining parcel. In *City of San Rafael* v. *Wood, supra,* 144 Cal.App.2d 604, 606-608, where the position of the parties and their contentions were reversed, the court held:

"Where, as in the instant case, the condemner secures an order for immediate possession, the condemnee is entitled to compensation for the loss of use of the property from the date of possession to the date of trial, even though the value of the property, under section 1249, is fixed at the time of trial. *Where the value of such use is not included in the judgment,* the condemnee is entitled to interest from the date of taking in lieu of the value of such use. . . .

"Appellants argue that the damage to their retained properties by the deposit of silt and the turbulence of the waters *caused by the construction* of the pumping plant [the improvement there involved] commenced on November 5, 1951, when respondent took possession of the condemned property. Therefore, so it is argued, they are entitled to interest from that date as compensation for the 'use' of the property involved in the severance damages. Respondent concedes, and it is clearly the law, that appellants are entitled to compensation for the loss of the 'use' of the property involved in the severance damages, and that compensation for such loss of use must be computed starting November 5, 1951. But respondent contends that such compensation for such loss of use *is not necessarily interest.* The proper rule is that the

trial court must ascertain *the actual loss* caused by such loss of use from the date of possession to the date of judgment, and then such sum should be included in the severance damages. *Interest may be used as a measure of such loss, but it is only awarded when the actual loss has not been fixed.* [Citations.] '' (Italics added.)

The jury in the instant case, as in every eminent domain proceeding, was required to determine all of respondent's recoverable damages resulting from the taking of its property including both past and future damages. Since the freeway had been completed and placed in operation on November 20, 1962, the jury could determine upon the basis of the evidence the present and future damages suffered by respondent. It determined that these damages amounted to $155,000. Respondent, of course, was also entitled to damages for the period prior thereto when heavy equipment, including pile drivers, were creating noise, dust and disturbing vibrations that affected its remaining property in the same fashion as ''deposit of silt and the turbulence of the waters'' affected the landowners in *City of San Rafael* v. *Wood, supra,* 144 Cal.App.2d 604. The jury fixed this loss in the amount of $35,000. We fail to see how appellant was prejudiced by the action of the jury in reaching and indicating its findings in two categories rather than in one total sum of $190,000.

In its presentation on this issue, appellant misconceives the holding in *People* v. *Ayon,* 54 Cal.2d 217 [5 Cal.Rptr. 151, 352 P.2d 519]. In *Ayon,* the parties had stipulated to ''the market value of the property actually taken *plus the damage to the remainder as a result of the severance.*'' (P. 220.) (Italics added.) In this posture the court held that the ''former'' landowner was entitled to no further or greater rights than any other property owner who might be temporarily inconvenienced by the construction of public improvements in an abutting street. As the Supreme Court pointed out at page 227 of the *Ayon* decision, to the extent that the appellants therein were entitled to damages ''for impairment of their right of access, these damages were . . . stipulated to by the parties. The stipulated sum of $5,800 covered 'the fair market value of Parcel 5 together with all improvements thereon *and the severance damage to the remainder by reason of the taking of Parcel 5 and the construction of the improvement in the manner proposed. . . .'* '' (Italics added.)

Parenthetically, it might be noted that the trial court, in apparent reliance upon the rule expressed in *Bellman* v.

*County of Contra Costa, supra,* 54 Cal.2d 363, restricted respondent's severance damages during construction to the two-year period preceding the filing of its claim. That is to say, the court allowed respondent no damages, either by way of computation of its actual loss or in the form of interest for the period beginning on February 1, 1960, when appellant began its initial invasion on the land in question, and ending August 13, 1960. Appellant contends that damages in the form of interest should have been allowed for this period, but since it benefited from this decision and respondent has not appealed therefrom, we need not consider whether such a limitation was mandatory.

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Schauer, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.